**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**JACKSON DIVISION**

PATRICIA PINTER                                                            PLAINTIFF

v.                                                        CAUSE NO. 3:11-CV-417-CWR-FKB

MICHAEL J. ASTRUE,                                                        DEFENDANT
*Commissioner, United States Social*
*Security Administration*

<u>ORDER</u>

Before the Court are the plaintiff's motion for summary judgment, Docket No. 11, the Social Security Administration's motion to affirm the Commissioner's decision, Docket No. 13, and the United States Magistrate Judge's Report and Recommendation, Docket No. 16. The Magistrate Judge recommends affirming the denial of disability benefits. *Id.* The plaintiff has objected, Docket No. 17, the government has responded, Docket No. 18, and the matter is ready for review.

The Court has reviewed the administrative record and compared it with the Social Security Administration's final decision denying disability benefits, which in turn is based upon the Administrative Law Judge's (ALJ) written decision denying benefits. This review reveals a serious disconnect between the record evidence and the government's determination.

For one, the ALJ's decision contains several pages of factual "findings" untethered to any evidence in this record. Reading the ALJ's decision, one is led to believe that claimant Patricia Pinter displays "excellent adaptive functioning" and has unremarkable abilities on dozens of indicators. These include basic abilities ranging from understanding public transportation and browsing the internet, to more advanced abilities like the capacity "to stand back and to observe and size up others by what they do and how they seem (body language, gestures, expressions, and the like) rather than simply by what they say and direct [sic]."

While Pinter may have some of these abilities, there is no basis for them in our record. These findings are simply not based on Patricia Pinter's case. As a result, conclusions derived from these findings are like the proverbial house built on a foundation of sand.

The Social Security Administration's procedural and evidentiary errors were not confined to one part of its decision. At step two, for example, the ALJ failed to evaluate whether Pinter has

borderline intellectual functioning (BIF), a diagnosis suggested by the government's own medical consultant. Later, the ALJ concluded that Pinter's depression had passed, when the evidence uniformly shows otherwise. As a result of just these two issues, the ALJ never considered the effect of the plaintiff's (possible) BIF or her (actual) depression on her ability to work successfully. There are other errors, as well, which will be discussed below.

The bottom line is that the ALJ's conclusions are unreliable because they are insufficiently grounded in evidence. Accordingly, the plaintiff's objection will be sustained and the case will be remanded to the Social Security Administration for a new hearing.

I.      *Procedural History*

In 2008, Patricia Pinter filed an application for Social Security disability insurance benefits and supplemental security income. R. 11.[1] She claimed a disability onset date in 2006. *Id.* Her application was denied, after which a hearing was held by an ALJ in 2010. *Id.* The ALJ denied benefits in a written decision, *id.*, and the Social Security Appeals Council affirmed, *id.* at 1. This suit followed.

In April 2012, after full briefing, the Magistrate Judge recommended affirming the Social Security Administration's decision. Docket No. 16. This Court's review commenced upon the filing of the plaintiff's objections and the government's response. Docket Nos. 17-18.

II.      *Standard of Review*

"On judicial review, the ALJ's determination that a claimant is not disabled will be upheld, if the findings of fact upon which it is based are supported by substantial evidence on the record as a whole, and if it was reached through the application of proper legal standards." *Loza v. Apfel*, 219 F.3d 378, 389 (5th Cir. 2000) (citations omitted). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Audler v. Astrue*, 501 F.3d 446, 447 (5th Cir. 2007) (quotation marks and citation omitted). "In applying the substantial evidence standard, we scrutinize the record to determine whether such evidence is present." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citation omitted). "We may not reweigh the evidence or substitute our judgment for that of the

---

[1] The administrative record, which is filed at Docket No. 10, will be cited as "R. __" using the numbers stamped on the lower right-hand corner of each page.

Commissioner." *Audler*, 501 F.3d at 447 (citation omitted).

III.     *Discussion*

The Social Security Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To receive disability benefits, a claimant's impairment or combination of impairments, *see id.* § 423(d)(2)(B), must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A).

In arriving at a decision, the ALJ proceeds through the familiar five-step sequential evaluation process, determining whether:

> (1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in appendix 1 of the social security regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity.  If, at any step, the claimant is determined to be disabled or not disabled, the inquiry is terminated.  The claimant bears the burden of showing she is disabled through the first four steps of the analysis; on the fifth, the Commissioner must show that there is other substantial work in the national economy that the claimant can perform.

*Audler*, 501 F.3d at 447-48 (citation omitted); *see Greenspan*, 38 F.3d at 236.  "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council."  *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (citation omitted).

Here, the ALJ found at step one that Pinter had not successfully worked since December 2006.  R. 13.  He then found that she suffered from the severe conditions of "seizures, depression/anxiety, and learning disability."  *Id.*  At step three, the ALJ determined that Pinter's impairments did not meet those listed in the CFR.  *Id.* at 15.  Finally, the ALJ concluded that Pinter could return with few restrictions to unskilled jobs she had done in the past (step four) and other jobs existing in the national economy (step five).  *Id.* at 23-25.

The Court will discuss these steps in order, beginning with step two.

A.     *Learning Disability / Borderline Intellectual Functioning*

At step two the ALJ determined that Pinter has a learning disability. *Id.* at 13. The finding was unusual because the evidentiary dispute the ALJ was charged with resolving was whether Pinter has borderline intellectual functioning (BIF) or is mildly mentally retarded.[2] Specifically, Dr. Boggs concluded that Pinter is of average to low average intelligence, *id.* at 389-90; Dr. Hudson, the government's medical consultant, thought Dr. Boggs' report supported a finding of BIF, *id.* at 441; and Dr. Schneider found Pinter to be mildly mentally retarded, *id.* at 440.[3] The ALJ rejected Dr. Schneider's conclusions about mental retardation. *Id.* at 21. But he skirted a determination on BIF, instead diagnosing a learning disability based on Pinter's low verbal IQ score. *Id.*

This was problematic because none of the doctors had concluded that Pinter has a learning disability, not even those that diagnosed her with a low IQ. And a person's low intelligence does not automatically mean they have a learning disability. *See* 20 U.S.C. § 1401(30) (defining learning disability); 34 C.F.R. § 300.8(c)(10) (same); *see, e.g.*, *Klein Indep. Sch. Dist. v. Hovem*, --- F.3d ---, No. 10-20694, 2012 WL 3155968, *1 (5th Cir. Aug. 6, 2012) (resolving IDEA claim brought by student who "demonstrated high intelligence (ultimately, a 142 IQ)" and had a learning disability).

The government argues that the ALJ's finding was properly based upon Pinter's self-reported learning disability. Docket No. 14, at 6. But Pinter was not qualified to make that objective, clinical assessment. *See* 20 C.F.R. § 416.908 ("A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms."); *Prince v. Barnhart*, 418 F. Supp. 2d 863, 868 (E.D. Tex. 2005) ("The only evidence of bone spurs is plaintiff's subjective testimony. By definition, that is insufficient to establish an impairment."). And it is troubling that the ALJ accepted Pinter's self-reported diagnosis when he

---

[2] "Borderline intellectual functioning describes individuals with IQ between 71 and 84. . . . Our case law indicates that borderline intellectual functioning should be considered a severe impairment." *Hunt v. Massanari*, 250 F.3d 622, 624-25 (8th Cir. 2001) (quotation marks and citation omitted) (remanding claim for a fourth hearing, where ALJ's hypothetical question to vocational expert insufficiently encompassed claimant's BIF, making that vocational expert's testimony not based upon substantial evidence).

"Mild mental retardation describes an IQ of 50-55 to approximately 70. There is a measurement error of approximately 5 points in assessing IQ, although this may vary from instrument to instrument. Thus, it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior. Conversely, Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning. Differentiating Mild Mental Retardation from Borderline Intellectual Functioning requires careful consideration of all available information." *Bouton v. Astrue*, No. 07-4039, 2008 WL 627469, *6 (D. Kan. Mar. 4, 2008) (citing the DSM-IV).

[3] This evidence is discussed in more detail in Part III.B, *infra*.

found almost everything else she said to be unreliable.  *See* R. 24.  "[T]he ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."  *Loza*, 219 F.3d at 393 (citations omitted).

> The Fifth Circuit has cited with approval Judge Posner's admonition that
>
> judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor. . . . The medical expertise of the Social Security Administration is reflected in regulations; it is not the birthright of the lawyers who apply them.  Common sense can mislead; lay intuitions about medical phenomena are often wrong.

*Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003) (quoting *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990)).  Here, in the absence of medical evidence, the ALJ was not permitted to diagnose an alleged learning disability.  That finding is not supported by substantial evidence.

This conclusion requires a harmless error analysis.  *Id.*  "Procedural perfection in administrative proceedings is not required as long as the substantial rights of a party have not been affected."  *Audler*, 501 F.3d at 448 (quotation marks and citation omitted).  *But see Newton*, 209 F.3d at 440 (remanding for a new hearing without conducting a harmless error analysis, where the ALJ made multiple errors and findings without substantial evidence); *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001) (same).

In this case, the ALJ's finding of a learning disability in and of itself was likely harmless.  Pinter's substantial rights were probably not affected by that finding.

On the other hand, the ALJ's failure to consider whether Pinter suffers from BIF, which is more severe than a learning disability, was not harmless.  A finding of BIF could have influenced the ALJ's assessment of Pinter's abilities and mental capacity to concentrate and work for ample periods of time.  *See Matthews v. Barnhart*, 347 F. Supp. 2d 1093, 1100-01 (M.D. Ala. 2003) (remanding case where ALJ failed to consider claimant's BIF).  If Pinter has a more severe mental impairment than the ALJ initially found, then her ability to work may be more impacted than he originally determined.  *See* SSR 85-15 ("The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.  A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base."); *Leidler v.*

*Sullivan*, 885 F.2d 291, 294 (5th Cir. 1989) (remanding and reiterating that when considering a claimant's mental illness, the ALJ should conclude that "he is disabled if he can perform work but not enjoy sustained employment because of his condition.").[4]

On remand, an ALJ should make findings on BIF and evaluate that impairment, if sustained, along with Pinter's other impairments. *Newton*, 209 F.3d at 440; *Matthews*, 347 F. Supp. 2d at 1101.

B.      *Mild Mental Retardation*

Part of Pinter's argument for disability benefits is that her impairment or combination of impairments met the requirements for mental retardation under Social Security guideline § 12.05. R. 36. A sub-part of that guideline is satisfied if the claimant proves that she displays "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." Social Security Administration, Disability Evaluation Under Social Security § 12.05C (Sept. 2008) [*hereinafter* "Blue Book"].

"The standard instrument for measuring intellectual functioning is the Wechsler Adult Intelligence Scales test (WAIS III)." *Moore v. Quarterman*, 342 F. App'x 65, 68 (5th Cir. 2009) (citation omitted). Like many tests, it is subject to measurement error and thus "may overstate or understate the subject's actual level of intellectual functioning." *Id.* (citation omitted). "Psychologists and other mental health professionals are flexible in their assessment of mental retardation; thus, sometimes a person whose IQ has tested above 70 may be diagnosed as mentally retarded while a person whose IQ tests below 70 may not be mentally retarded." *Id.* (quotation marks and citation omitted). "In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, [the Social Security Administration] use[s] the lowest of these in conjunction with 12.05." Blue Book § 12.00(D)(6)(c).

---

[4] In other Social Security cases pending in this district, the government has cited an Eleventh Circuit opinion for the proposition that an ALJ need not identify every severe impairment at step two, as long as the ALJ identifies at least one severe impairment and proceeds to step three. *See Heatly v. Comm'r of Soc. Sec.*, 382 F. App'x 823, 824-25 (11th Cir. 2010) (per curiam). That is permitted as long as the ALJ's step three analysis "has considered all of the claimant's impairments, whether severe or not, in combination." *Id.* at 825. The authority does not apply here because the ALJ did not consider all of Pinter's impairments at step three. The Court will return to harmless error later in this Order. *See* Part III.G, *infra*.

The ALJ in this case was presented with two sets of WAIS-III test results. In April 2008, Dr. Boggs found that Pinter scored a verbal IQ of 72, a performance IQ of 86, and a full scale IQ of 77. R. 389. Dr. Boggs concluded that Pinter was "of average to low average intelligence." *Id.* In April 2010, when Dr. Schneider administered the same test, Pinter scored a verbal IQ of 63, a performance IQ of 63, and a full scale IQ of 60. *Id.* at 440. These scores indicated mild mental retardation. *Id.*[5]

At the hearing, the ALJ observed that "the low score by Dr. Boggs" was "only two points off the requirement of 12.05C." *Id.* at 38. He said, "the scales given by the most recent testing by Dr. Schneider are significantly less than what was achieved two years ago. I'm not really sure which one may or may not be valid, but I'm not going to find myself restrained (INAUDIBLE) at this time." *Id.*

The ALJ's written decision discussed this dispute at three points. He first found that "[t]he findings on the WAIS-III by psychologist Schneider are not valid in light of the fact that claimant has incurred no cerebral infarct or closed head injury in the interim from 2008-2010." *Id.* at 21. Two pages later, he found that "Schneider's findings appreciated on the WAIS-III are valid and consistent with [Pinter's] activities of daily living, social relationships and employment history." *Id.* at 23. Third, he wrote that:

> In accordance with SSR 96-2p I assign no weight to the opinions and conclusions of psychologist Schneider. Mrs. Pinter was sent to psychologist Schneider on request by her representative. I note that her entire presentation was in stark contrast to that she presented before psychologist Boggs. Psychologist Schneider's opinions and conclusions are based entirely upon a singl[e] examination, and subjective assertions taken as truths which were never voiced to psychologist Boggs and behavioral presentations. As above fore cited, the severe deterioration in claimant's cognition from 2008 is highly suspect in light of no cerebral infarct or closed head injury. At a G.A.F. of 35 she would have impairment in reality and communication and she was not noted to be responding to external stimuli. Speech was not illogical, obscure or irrelevant. She gets out of the house and associates with others. At a 35 she would require institutionalization.

---

[5] Dr. Boggs also conducted a Wide Range Achievement Test - IV, which showed Pinter's math computation and word reading scores to be below average. R. 390.

Dr. Schneider also found Pinter to have a Global Assessment of Functioning (GAF) rating of 35. *Id.* at 441. "A GAF of 31-40 reflects a major impairment in several areas such as work, family relations, judgment, or mood." *Conklin v. Astrue*, 360 F. App'x 704, 707 n.2 (8th Cir. 2010) (citing the DSM-IV) (remanding for further consideration of claimant's mental RFC).

*Id.* at 25.[6]

Taking these points in order, it is not clear what the ALJ relied upon to determine that Dr. Schneider's WAIS-III scores were invalid. There is no record evidence concerning the role of cerebral infarcts or closed head injuries in crediting or discounting competing mental assessments, nor was a citation provided to an authority on that issue. Second, it is puzzling why the ALJ would declare Dr. Schneider's WAIS-III scores invalid, then two pages later affirmatively find that they were "valid and consistent with [Pinter's] activities of daily living, social relationships and employment history." *Id.* at 21. Further, the ALJ's "singl[e] examination" critique appears to apply equally to Dr. Boggs. *See id.* at 387. Dr. Schneider's examination was, at the very least, two years more current than Dr. Boggs' examination.

The ALJ's dismissal of Pinter's GAF rating warrants additional discussion. A GAF range of 31-40 corresponds to "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. Text Revision 2000) [*hereinafter* DSM-IV-TR]. The ALJ focused on the first half of that definition, by writing, "she would have impairment in reality and communication . . . . Speech was not illogical, obscure or irrelevant." R. 25. But an equally valid question was whether Pinter falls

---

[6] This paragraph was located in the portion of the decision discussing Pinter's residual functional capacity (RFC). R. 23-25. Had the ALJ earlier determined that Pinter met the criteria of a listed impairment (i.e., on the basis of mental retardation), though, the analysis would have halted and the RFC assessment would not have been necessary. *Durden*, 586 F. Supp. 2d at 838.

In any event, the placement of the paragraph suggests that Pinter's functional abilities may have been used to justify a finding that she was not mildly mentally retarded. But mild mental retardation is not necessarily inconsistent with basic adaptive skills and some work experience. *Id.* at 836-37. According to the DSM-IV, mildly retarded adults "usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress. With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings." *Id.* at 836 (quoting DSM-IV-TR 43). "A person can meet the diagnostic description of mild mental retardation even though she has worked in the past." *Id.* at 837 (citation omitted).

In *Durden*, for example, the claimant was able to do a wide array of household chores and other basic activities, but had few friends, experienced difficulty reading, did not live alone, and was ultimately determined to be mildly mentally retarded and disabled under a listed impairment. *Id.* at 838-39; *see also Spiva v. Astrue*, 628 F.3d 346, 352 (7th Cir. 2010) ("an ability to engage in 'activities of daily living' (with only mild limitations) need not translate into an ability to work full time.").

into the second half of that description: whether she has "major impairment in several areas."[7]

As an example of someone falling into this latter definition, the DSM describes a "depressed man [who] avoids friends, neglects family, and is unable to work." DSM-IV-TR at 34. Pinter meets at least three of those elements. There is compelling evidence that she is depressed. *See* Part III.C, *infra*. Dr. Boggs found that she has no friends and is withdrawn due to distrust of others. R. 389. And there is unrebutted evidence of several unsuccessful work attempts, a termination, and significant mental aggravation with work and coworkers leading to a seizure and loss of job. *Id.* at 35-36, 43, 47.

As a final point, the DSM does not indicate that a GAF rating of 35 requires institutionalization. DSM-IV-TR at 32-34.

Taken together, the ALJ's evaluation of Pinter's alleged mild mental retardation was in part internally inconsistent, in part unsupported by medical authorities or other substantial evidence, and in part at odds with the evidence of Pinter's actual functioning. On remand, the ALJ should reconcile the competing evidence and determine whether Pinter's claim of mild mental retardation is supported.

To the extent the ALJ finds the existing record evidence inadequate, he may issue interrogatories or ask another expert to assess the claimant. *Darden*, 586 F. Supp. 2d at 839; *Nelson v. Astrue*, No. 10-1218, 2011 WL 3819432, *6 n.6 (W.D. La. July 29, 2011) *report and recommendation adopted*, 2011 WL 3818969 (W.D. La. Aug. 26, 2011). ALJs are vested with that authority so that they may satisfy their "duty to a claimant to develop the record fully and fairly to ensure that [their] decision is an informed decision based on sufficient facts." *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (citation omitted).

---

[7] The DSM instructs that the GAF rating should be based on the worse of these two definitions:

The GAF rating is within a particular decile if **either** the symptom severity **or** the level of functioning falls within the range. . . . It should be noted that in situations where the individual's symptom severity and level of functioning are discordant, the final GAF rating always reflects the worse of the two. For example, the GAF rating for an individual who is a significant danger to self but is otherwise functioning well would be below 20. Similarly, the GAF rating for an individual with minimal psychological symptomatology but significant impairment in functioning (e.g., an individual whose excessive preoccupation with substance use has resulted in loss of job and friends but no other psychopathology) would be 40 or lower.

DSM-IV-TR at 32-33.

*C.      Depression*

The ALJ began step three by discussing Pinter's history of drug dependence and depression. R. 15.  He concluded that her drug dependence had been in remission since 2006.  *Id.*  That conclusion is supported by substantial evidence and will not be disturbed.

The analysis of Pinter's depression requires more discussion.  The ALJ cited medical records from 2002 and 2006 that described Pinter's depression in conjunction with her drug abuse.  Based on these records alone, and without looking at more recent evidence, he found that Pinter's "lack of coping skills-getting upset easily occur mostly during periods of alcoholic and Crystal Meth intoxication," and concluded that "when claimant has depression/anxiousness manifested by crying spells and insomnia it is transient and [an] expectable reaction to psychosocial stressors."  *Id.*  This was error because the record contains significant and unrebutted evidence that Pinter's depression persisted well after 2006, including through the hearing date.

In April 2008, for example, Dr. Boggs found that Pinter was "tearful," "worrying," and had "fear," "problems losing her temper," and "recurrent thoughts of self-harm."  *Id.* at 389.  "'I lay and cry all the time,'" she said.  *Id.*  The doctor's report continued, "The claimant has withdrawn due to her distrust of others.  She has no friends. . . . Her mood was dysphoric."[8]  *Id.*  Dr. Boggs diagnosed Pinter with "Depressive disorder NOS."  *Id.* at 390.  Dr. Boggs' diagnosis was also cited in Dr. Hudson's report.  *Id.* at 413.

In April 2010, Dr. Schneider found Pinter to suffer from "continuing depression" and reported her to be "completely unable to maintain emotional control."  *Id.* at 440-41.  "Her depression includes anhedonia, demotivation, melancholia, eruptions of pent-up rage, and absence of confidence."  *Id.* at 440.  Dr. Schneider diagnosed Pinter with "Major Depressive Disorder, Recurrent, Severe with Psychosis."  *Id.* at 441.

At the hearing, Pinter testified that she "stay[s] depressed all the time, constantly. . . . I can't handle being around a big crowd of people.  I just prefer being to myself.  And I feel, like right now, pressure all the time."  *Id.* at 39.

Without addressing that evidence, however, the ALJ twice concluded that Pinter "has no

---

[8]  Dysphoria is defined as "[a] mood of general dissatisfaction, restlessness, depression, and anxiety; a feeling of unpleasantness or discomfort."  Stedman's Medical Dictionary 599 (28th ed. 2006).

disorder or the thought process [sic] and adequate judgment since she has been in remission from alcohol and drugs." *Id.* at 16-17. He conflated Pinter's drug abuse with her depression, when those conditions are not coextensive.[9]

This section of the ALJ's findings contained additional inconsistencies:

--- The ALJ found that Pinter "has good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday concerns and problems." *Id.* at 15. Dr. Boggs, though, described her with phrases such as "tearful," "worrying," with "fear," and "problems losing her temper." *Id.* at 389. Dr. Boggs also found her "withdrawn due to her distrust of others" and without any friends. *Id.* Dr. Schneider's report was similar if not worse. *Id.* at 439-41. There is no evidence for the ALJ's over-optimistic findings.

--- The ALJ found that Pinter's "depression/anxiety is well controlled by medications." *Id.* at 15. While Pinter testified that depression medication had been helpful in the past, at the hearing she said she currently did not receive mental health treatment. *Id.* at 44. The record did not contain evidence of antidepressant use after February 2007. *Id.* at 109-10, 173, and 239-43. Further, Dr. Boggs wrote that Pinter actually felt "worse" taking Prozac and had slit her wrists while on Effexor in 1999. *Id.* at 388. Neither Dr. Boggs nor Dr. Schneider indicated that Pinter had a current prescription for antidepressants, much less conclude that those drugs well controlled her symptoms.

--- The ALJ found that Pinter "has never presented as a very depressed, worrisome, fearful individual . . . ." *Id.* at 16.[10] According to the record, though, that is exactly how Pinter presented to Dr. Boggs and Dr. Schneider. *Id.* at 389, 439-41. No competent evidence indicates otherwise.

Just in this section of the decision, therefore, the ALJ overlooked or disregarded evidence of Pinter's persistent depression; overlooked or disregarded evidence of the impact that depression has on her everyday life and ability to function; and conflated medication's ability to control Pinter's seizures with an ability to control her depression, the efficacy of which was not established. Several findings are diametrically opposed to the record evidence. "The ALJ's finding is fundamentally at

---

[9] While the ALJ did discuss Dr. Boggs' and Dr. Schneider's reports in his decision, it was not in the context of her depression. *See* R. 18-19.

[10] On review, the entire paragraph from which this finding was drawn appears to be either unsupported or contradicted by the record. *E.g.*, *compare* R. 16 (ALJ's finding that Pinter "is not easily confused . . . .") *with* R. 50 (Pinter's testimony that "I stay confused.").

odds with the evidence." *Loza*, 219 F.3d at 397; *see Myers*, 238 F.3d at 621 (remanding case where ALJ disregarded "evidence from six different doctors who all diagnosed some kind of back problem").[11]  Findings on evidence which does not exist are not based upon substantial evidence.

These errors were not harmless.  An overly optimistic evaluation of Pinter's depression would have skewed an assessment of her capacity to successfully work.  *See* Part III.G, *infra*.

D.      *Findings Regarding Pinter's Ability to Function*

The ALJ's step three analysis contained quite a few conclusions regarding Pinter's intellectual and social functioning.  *Id.* at 19-22.  Pinter has challenged many of those findings.  *See* Docket No. 12, at 27-28.  On review, the following statements in the ALJ's decision are not supported by evidence in this record:

> Claimant has excellent adaptive functioning in that she copes well with common life demands and meets the standards of personal independence expected of someone her age. . . . Claimant comparatively shops.  She knows the importance of reviewing sales slips and cash register receipts for errors in prices or sales tax. Claimant can budget for the family and live within that budget.  Claimant has a checking account and can balance the account.  Claimant knows right from wrong. Claimant looks both ways before crossing the street.  Claimant can recognize danger and use a telephone in calling police in an emergency and call the operator for assistance in finding out telephone numbers.  Claimant has no difficulty responding to change and can work related decisions [sic].  Claimant has no issue with demoralization or low self-esteem and has adequate social skills.  Claimant knows how to prepare meals on the stove as well as use microwave oven.  Claimant comprehends the importance of hygiene in work setting [sic] and bathes daily and uses deodorant.
>
> . . . Claimant is not vulnerable to exploitation by others or being denied her rights and opportunities. . . . Claimant drives a motor vehicle and she is further capable of getting to her destinations by use of public transportation or cabs.
>
> . . . Claimant has no pathological cognitive processes in regard to visual perception, linguistic processes, attention, or memory. . . . Claimant knows how to ask for assistance if she doesn't comprehend materials. . . . Claimant does not have a markedly limited vocabulary, difficulty recalling words or producing sentences with appropriate length or complexity or difficulty expressing ideas.  Claimant has no difficulty comprehending words, sentences, or specific types of words. . . .

_____

[11]  While it is not clear how these errors occurred, their nature and repeated occurrence suggest that portions of another claimant's decision were incorporated into Pinter's decision, or perhaps pattern language was improperly used to resolve Pinter's claim.

Claimant has set up her own bank account and checking account so that she can receive payments directly deposited into her bank account.

. . . I further notice that throughout procedural history of record claimant has an attractive handwriting as well as print.

Claimant is keen and efficient in her concentration, attention span, and immediate retention and recall. Claimant is capable of performing non-complex arithmetic calculations. Claimant has excellent skills in regard to accumulation of practical, everyday knowledge and information (common facts, figures, names, dates, places, etc.) and in her employment of reason and logic and his [sic] ability to take what she has learned in the past and to abstract and generalize such knowledge and information for problem-solving in both the present and future. She is skilled in her recognition and use of the written and spoken word (functional vocabulary) as well as in her employment of common sense, practical judgment and in her social development and comprehension (ability to discern and to determine right and wrong and to understand what she should and should not do and why and why not). . . . Claimant is solidly average in her ability to stand back and to observe and size up others by what they do and how they seem (body language, gestures, expressions, and the like) rather than simply by what they say and direct [sic]. She is borderline in her giving of close visual attention to the minute, but important, details of familiar aspects of the physical world in which she lives.

. . . She may not be able to recognize and use singular and plural nouns and verbs in written and verbal expressions. . . . She can locate information in a book or telephone book utilizing alphabetical order, guidewords, table of contents and indexes. She can use a dictionary to locate information and determine correct spelling. She can surf the Internet for information. She can deliver and receive telephone messages identifying who, what, why, how, and when. She can write a personal letter utilizing the correct format, punctuation and capitalization. She can read and comprehend informational signs, warning labels and safety signs. She knows how to comprehend public transit schedules.

Claimant knows how to locate various community services for emergencies regarding her family (911), health care (state funded facilities in treatment for physical/mental conditions or drug/alcohol addictions), legal offenses, education and job training/employment. She can define the government and the law in terms of his [sic] citizenship levels of government, elections and legal systems.

Claimant can define health competencies on diets, diseases, health care, safety and drug abuse. She can identify common causes of certain diseases and symptoms, which require medical attention. She can identify hazardous situations in her home and take appropriate preventative measures. She does not know how to administer first aid[]. She can identify current methods of birth control and safe-sex

practices. She knows the four food groups but does not always apply nutritional concepts to meal planning.

Claimant seldom has deficiencies of concentration, persistence of pace [sic] resulting in her failure to complete tasks in an appropriate and timely manner.

. . . In activities of daily living, the claimant has no restrictions. . . . She is independent in her use of public transportation. She does not get upset easily when in areas she is unfamiliar with and looks for a passerby to direct her to a street she knows. She has adequate energy to perform household activities without her needing frequent breaks in between activities.

. . . She is at times easily upset with perceived slights. She can accept criticism and has never been terminated from work. She has the capacity to interact appropriately with the general public; . . . to get along with coworkers and peers without distracting them or exhibiting behavioral extremes. . . . She does not feel useless. . . .

. . . She can . . . maintain attention and concentration for extended periods . . . and to complete a normal workweek within interruptions from psychologically based symptoms . . . .

. . . She can maintain attention and concentration for more than brief periods of time and perform and complete work tasks in a normal work day or week at a consistent pace without needing frequent breaks or operating at a slower pace.

R. 19-22.

Some of these assertions may be true – Pinter may know how to use the phone book and take phone messages. But there is no evidence that warrants an ALJ making that conclusion. Similarly, Pinter may or may not know how to use public transportation, which is the subject of several factual findings. There is no individualized evidence about public transportation, though, and the Court will note that public transportation is not a common means of transport in Forest, Mississippi.[12]

Other findings are not appropriately limited. Pinter's ability to interact appropriately with

_____

[12] On Pinter's mental residual functional capacity assessment, Dr. Hudson checked a box stating that Pinter was "not significantly limited" in her "ability to travel in unfamiliar places or use public transportation." R. 425. Since that assessment was on a standard form and Pinter is in rural Mississippi, in our case the box may be referring specifically to Pinter's ability to travel to unfamiliar places, and not to public transportation.

Even assuming that Dr. Hudson intended both findings, though, the ALJ's decision did not track Dr. Hudson's report. Instead, he concluded that Pinter can use public transportation or cabs and "knows how to comprehend public transit schedules." *Id.* at 19-20.

the general public, respond to supervisors, and complete a regular workday and workweek without interruptions from psychologically-based symptoms, among others, are in fact all "moderately restricted," which indicates a more limited functioning than the ALJ found. *Id.* at 222, 420, 422.

More troubling are those findings that are directly contradicted by the record. Pinter, in fact, does have significant problems with attention span, concentration, and energy. *Id.* at 50, 176, 205-06, 211-14[13], 222, 322, 420.[14] She has been terminated from work before, for several different reasons. *Id.* at 42-43, 47, 182. She has difficulty comprehending specific types of words. *Id.* at 40. She has felt useless. *Id.* at 322. And she describes significant aggravation and difficulty with work and interactions with coworkers. *Id.* at 47.

The source of the ALJ's factual findings is unknown. Some of them may have been drawn from another claimant's determination; other parts may be pattern language. Regardless, they lack fidelity to the evidence in our record. The lack of evidence is the antithesis of substantial evidence. On remand, the ALJ should make individualized findings about Pinter's abilities. *See* SSR 86-8 ("The disability determination or hearing decision must be set forth carefully. . . . Reasonable inferences may be drawn, but presumptions, speculations and suppositions should not be substituted for evidence.").

E.     HALLEX

When a claimant appeals an adverse ALJ decision to the Social Security Appeals Council, the Social Security Administration's "Hearings, Appeals and Litigation Law Manual" (HALLEX) requires the Appeals Council to "specifically address additional evidence or legal arguments or contentions submitted in connection with the request for review." *Newton*, 209 F.3d at 459. A prejudicial failure to address new evidence is grounds for remand because "where the rights of individuals are affected, an agency must follow its own procedures, even where the internal

---

[13] As just one example, Pinter's mother-in-law reported that Pinter sometimes "is too weak to finish [cooking] the meal she has started." R. 211.

[14] "A critical component of all competitive work, including unskilled, is the ability to sustain attention, persistence, and pace for prolonged or extended periods of time." *Puente v. Astrue*, 738 F. Supp. 2d 669, 688 (S.D. Tex. 2008) (remanding to develop record on that issue); *see also Wingo v. Bowen*, 852 F.2d 827, 831 (5th Cir. 1988) ("Wingo is capable of sitting as many as six hours. This particular capability would qualify Wingo to perform sedentary work only in a theoretical sense, however. To be capable of performing sedentary work under the guidelines, an individual must have some reasonable chance in the real world of being hired and, once hired, of keeping the job.").

procedures are more rigorous than otherwise would be required." *Id. But see Valdez v. Astrue*, No. 3:10-CV-0619, 2011 WL 2455564, *8 (N.D. Tex. June 15, 2011) (discussing split of authorities on whether the Appeals Council is required to discuss and respond to new evidence).

It is not obvious whether there was a HALLEX violation in this case. Pinter did appeal to the Appeals Council and did submit new evidence to that body, in the form of elementary school records showing her relatively poor academic performance. R. 244-55. Her accompanying brief argued that the records showed "adaptive problems that were initially manifested before age 22," as part of a larger argument that she met the criteria for a listed impairment. *Id.* at 245-47; *see* Blue Book § 12.05 ("Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."); *see also Durden*, 586 F. Supp. 2d at 832-33 (holding that an adult claimant's low IQ scores may presumptively establish her IQ prior to the age of 22).

The Appeals Council determined that the school records were not relevant because they were dated prior to Pinter's alleged disability onset date of December 8, 2006. R. 2. That explanation misses a critical distinction. In general, it may be reasonable to not consider newly-submitted medical records dated before the disability onset date, since the claimant does not allege that they were disabled at the time the records were created. Where the claimed onset date for a disabling back injury is 2010, a medical record from 2000 is probably irrelevant. *E.g.*, *Newton*, 209 F.3d at 459-60.

But that reasoning is unhelpful in this context, where Pinter submitted past school records to show an initial manifestation of mental retardation. Pinter is claiming that she had preliminary signs of mental impairment as a child that should be considered *alongside* contemporaneous evidence of mental retardation as defined in either § 12.05 A, B, C, or D. *See* R. 414. That is appropriate to consider on administrative appeal. *See Randall v. Astrue*, 570 F.3d 651, 660 (5th Cir. 2009); *Durden*, 586 F. Supp. 2d at 833.

"[P]rejudice results from an Appeals Council's violation of agency rules such as those set forth in HALLEX if the new or additional evidence presented to the Appeals Council might have led to a different decision." *Speights v. Barnhart*, No. 04-003, 2004 WL 3331910, *7 (M.D. La. Nov. 30, 2004), *report and recommendation adopted*, 2004 WL 3354861 (M.D. La. Dec. 27, 2004).

Because the elementary school records were relevant to a finding under § 12.05, the Appeals Council may have been required to discuss them and explain why they ultimately did not support her claim. *See id.* Although this issue is likely moot since the case will be remanded for a new hearing, it is noted for the Social Security Administration's further review on remand.

      F.    *Other Considerations*

          1.    Vocational Expert

At the hearing, Pinter's attorney attempted to ask the vocational expert a hypothetical question incorporating all of the "moderate" restrictions found in Dr. Hudson's report. *See* R. 420. Before the vocational expert could answer, the ALJ interjected, saying, "Counsel has used a hypothetical with the term, moderate. I've not seen the term, moderate, defined. If you wish to answer, or think you're able to do, you may do so. I will tell Counsel, or advise him, I can attribute no weight to whatever answer is in response to that, as such a term is undefined. He may proceed as he sees fit." *Id.* at 55. Pinter's attorney replied, "Okay. The term, moderate, as defined by the Social Security Administration, is affected, but not precluded, but within the realm of a severe impairment," and again attempted to ask the question. *Id.*

The vocational expert's answer was transcribed in our record as "INAUDIBLE – 8 seconds" and therefore could not be reviewed on administrative appeal or in this proceeding. *Id.* Portions of the vocational expert's responses to counsel's follow-up questions were also transcribed as "INAUDIBLE." *Id.* at 56. Pinter contends that the vocational expert's responses to this line of questioning supported her claim that "no work could be performed." Docket No. 15, at 9.

Although transcription errors inevitably occur, this colloquy was critical. On remand, the transcript should be sufficiently developed to contain the vocational expert's complete answers. That is necessary for adequate review.

In addition, at the next hearing counsel should be permitted to incorporate the term "moderate" into his questions. That term is used throughout Social Security proceedings, including Pinter's. Dr. Hudson, for example, found Pinter to be "moderately limited" in nine areas of the mental RFC. *Id.* at 420-25. And the ALJ used the term "moderate" several times in his decision. *Id.* at 21, 22, 23. The ALJ should give weight to that term consistent with its definition and usage

in Social Security disability determinations.[15]

2.    Credibility

At one point in his decision, the ALJ wrote the following:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity.

*Id.* at 24.  This boilerplate language has been called into question as vague and unhelpful by the Seventh Circuit, which:

> criticized the handling of social security disability claims in the following respects: (1) opinions of administrative law judges denying benefits routinely state (with some variations in wording) that although 'the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, . . . the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible,' yet fail to indicate which statements are not credible and what exactly 'not entirely' is meant to signify.

*Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir. 2010) (citation omitted) (collecting cases).

As in *Spiva*, it is not clear what part of Pinter's testimony the ALJ found not credible.  The discussion immediately following this boilerplate language recited some of the medical evidence. R. 24.  One adverse credibility finding that can be inferred from that recitation is that the ALJ did not believe that Pinter cannot afford seizure medication, since she buys cigarettes.  *See id.*  But the remainder of the discussion does not support an adverse credibility finding.  For one, the summary of facts showing that Pinter can perform household chores is not inconsistent with her impairments. *See* Part III(B)-(C), *supra*.  To the extent there are other credibility determinations lurking, if they are grounded in factual findings that are unsupported by substantial evidence, they cannot be sustained.  *Sonnen v. Astrue*, No. H-10-4109, 2012 WL 3527921, *22-23 (S.D. Tex. Aug. 13, 2012).

In addition, the evidence of Pinter's depression and below average mental ability, and the impact of those impairments on her daily life, are all well-supported in the record.  To the extent the ALJ's credibility determination was based on that evidence, he was required to articulate specific

---

[15]  The Court need not reach Pinter's other vocational expert argument, concerning a conflict between the vocational expert's testimony and the Dictionary of Occupational Titles.

reasons why Pinter's testimony on those factors was not credible. *See Abshire v. Bowen*, 848 F.2d 638, 642 (5th Cir. 1988); *e.g.*, *Johnson v. Astrue*, No. H-11-563, 2012 WL 3527972, *14 (S.D. Tex. Aug. 14, 2012). On remand, the ALJ should state with specificity which parts of Pinter's testimony are not credible.

      *G.     Harmless Error Revisited*

"Harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error." *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (citations omitted). "The major policy underlying the harmless error rule is to preserve judgments and avoid waste of time." *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (citation omitted) (declining to remand case where remand "would produce the same result while wasting time and resources."). Accordingly, the question is whether there is a reasonable possibility that a different conclusion could be reached if Pinter's case is remanded for a second hearing, or whether another hearing would be a waste of time.

The government's strongest argument for harmless error is that any finding of BIF would not have changed Pinter's mental RFC. Docket No. 14, at 9-10. It reasons that the doctor who identified BIF, Dr. Hudson, also concluded that Pinter had the mental capacity to work, which was a finding adopted by the ALJ. R. 23, 411, 420-26. Even assuming Pinter suffers from BIF, then, she still can perform her past work or other jobs existing in the national economy.

The government has presented a reasonable argument, but it is unpersuasive for several reasons.

First, the ALJ's errors were not limited to the failure to evaluate BIF at step two. Recall that the first part of step three contained a variety of erroneous findings regarding Pinter's depression, which left that impairment not fully evaluated. The ALJ's rejection of mild mental retardation was internally inconsistent and in part unsupported by evidence, warranting supplementation. And the analysis of Pinter's abilities was compromised by dozens of factual findings that are not based on the evidence in this case. These errors, taken together, suggest that the ALJ could reasonably have found Pinter to suffer from more impairments, and more severe impairments, than he actually did.

All of these impairments had to be considered, because "[t]he law of this Circuit requires consideration of the combined effect of impairments: The well-settled rule in this Circuit is that in making a determination as to disability, the ALJ must analyze both the disabling effect of each of

the claimant's ailments' and the combined effect of all of these impairments." *Loza*, 219 F.3d at 399 (quotation marks and citation omitted) (remanding case because ALJ did not adequately consider combination of claimant's impairments); *Beck v. Barnhart*, 205 F. App'x 207, 211 (5th Cir. 2006); *see* 20 C.F.R. § 404.1523 ("the combined impact of the impairments will be considered throughout the disability determination process"). As one district court has written, "[f]ailure to consider combined impact of multiple impairments constitutes a failure to apply correct principles of law." *Prince*, 418 F. Supp. 2d at 867.

In short, the ALJ's findings may change after considering the combination of Pinter's impairments. They could also result in Pinter meeting the criteria for a listed impairment, in which case she would be presumptively disabled and it would not be necessary to evaluate Pinter's capacity to perform work. *See Durden*, 586 F. Supp. 2d at 838.

Second, assuming that the analysis proceeds beyond step three, a full understanding of all of Pinter's impairments may modify the vocational expert's testimony as to Pinter's ability to work. As an example, if on reconsideration Dr. Schneider's GAF rating is sustained, or another expert provides a GAF rating, a vocational expert may testify – or confirm – that Pinter cannot work. *E.g.*, *Barber v. Barnhart*, 459 F. Supp. 2d 1168, 1172 (N.D. Ala. 2006) (recounting vocational expert's testimony that a GAF rating of 50 "would preclude work opportunity" and that a GAF score of 38 "is even more serious and would also preclude work.").

Third, the ALJ's conclusions regarding Pinter's capacity to function are not credible to the extent they are based upon the many unsupported findings of fact. As discussed above, pages of the ALJ's findings were unsupported or directly contradicted by the evidence. These findings – which generously credited Pinter with mental reasoning and skills she may not have – cannot be presumed to be irrelevant to the later conclusion of Pinter's functional capacity; earlier findings necessarily inform later ones. There are simply too many incorrect findings of significance to conclude that the errors were harmless.

In another Social Security case, Judge Posner wrote the following about harmless error:

> The government seems to think that if it can find enough evidence in the record to establish that the administrative law judge might have reached the same result had she considered all the evidence and evaluated it as the government's brief does, it is a case of harmless error. But the fact that the administrative law judge, had she considered the entire record, might have reached the same result does not prove that

> her failure to consider the evidence was harmless.  Had she considered it carefully,
> she might well have reached a different conclusion.

*Spiva*, 628 F.3d at 353.  Unlike in that case, the government's argument in our own is not unreasonable.  But it is difficult to find harmless error when there are so many evidentiary problems in the decision.  This case is one with too many moving parts to conclude that the outcome of another hearing will necessarily be adverse to Pinter.  *E.g.*, *Bragg v. Comm'r of Soc. Sec. Admin.*, 567 F. Supp. 2d 893, 913 (N.D. Tex. 2008).  The findings are not supported by substantial evidence. The harmless error argument is unavailing.

*IV.*     *Conclusion*

For these reasons, the plaintiff's objection is sustained, the Report and Recommendation is overruled, the government's motion to affirm is denied, and the plaintiff's motion for summary judgment is granted.  The case is remanded to the Social Security Administration for a new hearing. A separate Final Judgment will issue this day.

**SO ORDERED**, this the 25th day of September, 2012.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE